UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADEMOLA BELLO,<br><br>Plaintiff,<br><br>-against-<br><br>THE CITY OF NEW YORK and WINNIE CHEN and JEANINE MARIE, Individually,<br><br>Defendants. | **COMPLAINT**<br><br>Civil Case No.: **25-cv-05830**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ADEMOLA BELLO ("Plaintiff" or "Mr. Bello"), by and through his attorneys, JOSEPH & NORINSBERG, LLC, as and for his Complaint against the CITY OF NEW YORK ("CCRB" or "City"), which owns, operates, maintains and controls the New York City agency known as the CIVILIAN COMPLAINT REVIEW BOARD ("CCRB"), WINNIE CHEN ("CHEN"), and JEANINE MARIE ("MARIE") individually, collectively hereinafter ("Defendants") alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**NATURE OF THE CASE**

1.    This is a civil action for damages and equitable relief based upon the willful violations that Defendants committed of Plaintiff's rights guaranteed to him by: (i) the unpaid overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a); (ii) the unpaid overtime provisions of the New York Labor Law ("NYLL"), NYLL § 160; (iii) the NYLL's implementing regulations, the New York Codes, Rules and Regulations ("NYCRR"); (iv) the pay equity provisions of the New York Labor Law § 194 ("NYLL § 194"); (v) the anti-disability and anti-national origin discrimination and retaliation provisions of the New York State Human Rights Law ("NYSHRL"); (vi) the anti-disability and anti-national origin discrimination and retaliation

provisions of the New York City Human Rights Law ("NYCHRL"); and (vii) any other violations that can be inferred from the facts set forth herein.[1]

## PRELIMINARY STATEMENT

2.     This case is not just about discrimination—it is about the grotesque bigotry and hypocrisy of the Civilian Complaint Review Board ("CCRB"), an agency sworn to investigate police misconduct, yet one that subjected a 52-year-old Nigerian man to inhumane abuse within its own walls. While the CCRB claims to stand against injustice, it was simultaneously enacting its own brand of xenophobia—treating Plaintiff like chattel labor, weaponizing his African identity to strip him of dignity, and retaliating when he dared to speak up.

3.     The CCRB publicly brands itself as a guardian of civilian rights, promising impartial investigations into misconduct. But internally, it became the very thing it was created to fight. Plaintiff—an Ivy League-educated, award-winning playwright—was reduced to the status of a pack mule, singled out for demeaning manual labor no other employee was asked to perform. His only crime was being born African.

4.     Defendant WINNIE CHEN, under the direct supervision and with full backing from Deputy Executive Director JEANINE MARIE, used her position to target Plaintiff as if he were property. Hired as an administrator, CHEN repeatedly ordered Plaintiff to haul furniture, office supplies, boxes of paper and filing cabinets, despite no other desk employee—with Plaintiff's title—being assigned similar tasks. He tore his knee in the process, requiring medical care. When HR validated the injury and approved a workers' comp claim, CHEN responded not with concern,

---

[1] Upon the EEOC's dismissal of Charge No. 520-2025-04203 and issuance of a Notice of Right to Sue, Plaintiff will amend this Complaint to add discrimination, and retaliation claims under the Americans with Disabilities Act against Defendant City of New York.

but coercion: withdraw the claim, skip the MRI, and instead rub on her "Chinese oil," or face consequences.

5.    After Plaintiff refused Chen's Chinese remedy, her abuse escalated. Chen barred Plaintiff from eating at his desk like his peers, refused to grant him remote work privileges or salary increases that others—non-African, less qualified—were routinely afforded, and threatened he would "never" receive a raise again. Meanwhile, the agency forced him to report before dawn and stay past 5 p.m. to cover reception duties—routinely working more than 40 hours a week without repeatedly receiving any lawful overtime, in open violation of the FLSA and NYLL. And when he questioned this exploitation, the response was unambiguous: "You can resign."

6.    Emotionally battered and psychologically depleted, Plaintiff finally did just that— submitting a resignation in March 2025 to escape the unrelenting bigotry and hostility. Only then did CCRB Executive Director JONATHAN DARCHE call him and admit what the agency already knew: CCRB's Chief Prosecutor ANDRE APPLEWHITE had reported that Plaintiff had been treated "unfairly."

7.    Darche urged Plaintiff to stay so he could "look into it." Plaintiff made it clear: this was not just unfairness—it was racial discrimination. Yet Darche never followed up, never investigated, never held anyone accountable. Still, in a show of good faith, Plaintiff rescinded his resignation, believing his complaint would be taken seriously. He was wrong.

8.    Since then, CCRB has done nothing—no interviews, no inquiry, no disciplinary action against Chen or Marie. The agency's silence was not just complicity—it was cover-up.

9.    Instead of justice, Plaintiff was shipped off to another unit—against his will— where the retaliation continued. He was mocked, told that this was his "last stop," that he didn't fit the "criteria" for his new boss, and that, because he was not "White," he would never meet her

3

expectations. The message was unmistakable: CCRB was enraged that he had filed a workers' compensation claim and was now actively "looking for a reason" to fire him.

10.     Meanwhile, Chen and Marie—despite committing flagrant violations of labor law and basic human decency—faced zero consequences. As one CCRB insider told Plaintiff with chilling clarity: "It's about status… and if it's between you and CHEN, you lose." That wasn't just a comment—it was a confession.

11.     There is no other word for this but hypocrisy of the highest order. The very agency entrusted with protecting New Yorkers from abuse by state actors actively dehumanized an African employee, treating him like a second-class servant, exploiting his body, silencing his pain, and retaliating against him for daring to fight back. Despite his impeccable credentials, Plaintiff was seen not as a colleague, but as a "lowly African"—good for lifting boxes, but unworthy of equal treatment. That this happened inside a civil rights agency is not just ironic—it is a disgrace.

12.     Defendants flouted the FLSA , NYSHRL,  NYCHRL, and  the NYLL (including its Wage Theft Prevention Act amendments) by: (i) discriminating against Plaintiff's disability and Nigerian heritage; (ii) denying him equal pay and overtime premiums for substantially similar— and often more onerous—work; (iii) issuing wage statements that concealed those underpayments; and (iv) retaliating the instant he invoked statutory protections.

## JURISDICTION AND VENUE

13.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 29 U.S.C. § 201, et seq. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

14.     Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2), as Defendants resides within this judicial district, and as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

15.     At all relevant times, Plaintiff is an individual who worked and continues to work for Defendants in New York and was an "employee" entitled to the protections as defined in the FLSA, NYLL, NYCRR, NYSHRL, and the NYCHRL.

16.     The CCRB is an independent municipal agency of the City of New York, with its principal office and service of process located at 100 Church Street, 10th Floor, New York, NY 10007.

17.     At all relevant times, Defendant CITY OF NEW YORK owned, operated, maintained and controlled the CCRB.

18.     At all relevant times, Defendant CITY OF NEW YORK was and is Plaintiff's "employer" within the meaning of the FLSA and NYLL. Additionally, the CCRB employs well over two people and, as a public agency, is automatically covered by the FLSA. Moreover, in the ordinary course of its operations, Defendants' employees routinely use computers, telecommunication equipment, investigative tools, office supplies, and other goods that have moved in interstate commerce; transmit electronic data and payments across state lines; and rely on out-of-state vendors and service contracts. These activities, together with Defendants' annual operating budget exceeding $500,000.00, place Defendants squarely within the FLSA's overtime provisions.

19.    At all Relevant times Defendant WINNIE CHEN is the Director of Operations at the CCRB, actively oversaw in the day-to-day operations and was one of Plaintiff's direct supervisors.

20.    At all Relevant times Defendant JEANINE MARIE is the Deputy Executive Director of Administration, who over saw Oversee the administrative performance and daily operations of the Division of Financial and Strategic Management and was one of Plaintiff's direct supervisors.

## BACKGROUND FACTS

21.    Plaintiff, a 52-year-old Nigerian man, graduated from the Columbia Graduate School of Journalism, in 2014 where he was a recipient of the Wayne W. and Frances G. Knight Parrish Scholar.

22.    Plaintiff, who is an award-winning playwright, lyricist, novelist, scholar, applied for and obtained a position with Civilian Complaint Review Board, and commenced his employment with the CCRB on September 25, 2023, as an Investigator Level 1.

23.    On or about December 11, 2023, Plaintiff then transitioned to the role of Administrative Coordinator within the Division of Financial and Strategic Management ("Finance Division") with an annual salary of $46,971.97.

24.    The Finance Division is led by Defendant MARIE and Defendant CHEN reports into her.

25.    During Plaintiff's entire time working in the Finance Division, he always worked under the direct  supervision of MARIE and CHEN.

***Plaintiff is Paid less than Non-Nigerian Similarly Situated Employees for doing Substantially the Same Work***.

26.     From the inception of his employment CHEN, with the assistance of her enabler MARIE, treated Plaintiff differently, and denied him the privileges, consideration, and respect that she granted to her other direct reports.

27.     Despite his administrative title and modest compensation, Plaintiff is a skilled writer and rapidly proved himself to be an indispensable asset to the CCRB.

28.     Early into his tenure Plaintiff undertook responsibilities that significantly outstripped his job description and pay grade.

29.      Plaintiff was directed to take the lead in drafting the CCRB's Five-Year Accessibility Plan, from scratch in collaboration with Assistant General Counsel Kerry S. Jamieson ("Jamieson").

30.     Of note, MARIE asked CHEN and Deputy Director of Operations, Manuela Blanc to assist, as this is a project that should have been led by individuals in more senior roles. However, they both refused, stating they did not have enough time.

31.     As a result, Jeanine MARIE instructed Plaintiff to read the mission statements of all seventy-two NYC government agencies. Further, Plaintiff also painstakingly researched all relevant city and state laws to ensure the finished product was consistent with legal standards.

32.     Over the span of approximately six months Plaintiff almost single handedly drafted the CCRB's five-year accessibility guideline.

33.     When the plan was submitted in a timely manner, Jameison praised Plaintiff's contributions as "invaluable to getting the draft done on time."

34.     However, despite taking on and excelling at job duties more in line with an individual in senior roles earning approximately $200,000.00 (annually) the CCRB continued to compensate Plaintiff the same paltry salary of $46,971.97.

35.     In addition to taking on drafting the CCRB's five-year plan – again a function typically handled by leadership – the CCRB also had Plaintiff perform duties, typically done by the Recruitment Director.

36.     In June of 2024, Director of recruitment, David Geffrard ("Geffrard"), resigned from the CCRB.

37.     After Geffrard's departure, MARIE directed Plaintiff to take over the bulk of Geffrard's recruiting responsibilities.

38.     As a result, Plaintiff, single-handedly managed job postings and applicant screenings. Plaintiff screened countless applicant resumes, cover letters and even transcripts for hiring managers. For example, Plaintiff reviewed **470** applicants for the Data Analysts position. Plaintiff read all applicant resumes, cover letters, and transcripts, and painstakingly selected nine outstanding applicants for the hiring manager to interview and consider for the position.

39.     Of note, during Geffrard's tenure he worked remotely five days a week.

40.     Further, when Geffrard resigned, his annual base salary was approximately $91,500.00 (ninety-one thousand five hundred dollars).

41.     Despite Plaintiff taking on Geffrard's primary responsibilities and performing substantially the same work, MARIE authorized no increase, and Defendants continued to pay him the same paltry salary of $46,971.97 (forty-six thousand nine hundred seventy-one dollars and ninety-seven cents), while requiring Plaintiff—despite his requests to work remotely—to work in person five days a week.

42.    Defendants also used Plaintiff's excellent writing skills to write grants and conduct research while again paying him far below what a grant writer would earn.

43.    And Plaintiff performed the above-described job functions, while continuing to execute the job functions that were actually listed in his job description that are posted on CCRB's website.

44.    In November 2024, Plaintiff justifiably requested a pay raise from CHEN based on his extensive and impactful contributions, and she callously, despite being fully aware of the duties and job functions that he had taken on well above his pay grade, immediately rebuffed him, unequivocally stating he would not be receiving any raise.

45.    CHEN then escalated the matter to Marie, her cohort in bigotry, who subsequently, and again without taking into consideration the high-level tasks that Plaintiff had been performing for the CCRB's benefit, telephoned Plaintiff to venomously affirm that he was ineligible for a pay raise, and then insidiously suggested he should "resign" if his compensation was unsatisfactory.

### _Defendants Willfully Failed to Pay Plaintiff His Overtime Wages Owed_

46.    In addition to paying Plaintiff significantly less, for doing substantially the same work as non-Nigerian employees, the CCRB also willfully failed to compensate Plaintiff when he worked overtime.

47.    Plaintiff's "official" work schedule was from 9:00 a.m. to 5:00 p.m., Monday to Friday.

48.    However, whenever front-desk personnel were absent, which was frequent MARIE, with CHEN's knowledge, would instruct Plaintiff to cover reception before business hours, at times as early as 6:30 am, and after business hours, at times as late as 6:00 p.m.

49.     Yet, despite the CCRB receiving the benefit of Plaintiff covering the front desk, Defendants routinely and willfully failed to pay him for almost all of those additional hours he worked over forty each week.

50.      Defendants configured City Time so that hours worked before 9:00 a.m. could not be recorded.

51.     When Plaintiff covered the front desk, he would swipe in and email Defendants MARIE and CHEN when he started his workday at approximately 6:30 a.m. and then email them again when he signed off.

52.     But in order for him to receive overtime pay, either MARIE or CHEN would have to manually authorize these hours, which they routinely refused to do.

*53.*      Indeed, Defendants conditioned any overtime payment on Marie's undocumented discretion, thereby concealing the hours Plaintiff worked and violating federal and state record-keeping mandates. When Plaintiff repeatedly sought payment for his overtime specifically related to the hours he worked covering the front desk—MARIE and CHEN would respond, ***"you will be working for nothing."***

54.     Defendants also automatically deducted a one-hour meal break even though Plaintiff's lunch period was repeatedly interrupted—or skipped altogether—because he alone covered reception further adding to his unpaid compensation.

55.      Further, as mentioned above, Plaintiff drafted the agency's Five-Year Accessibility Plan and took on recruitment functions. To ensure the CCRB met its deadline for the Five-Year Accessibility Plan and that potential job applicants were timely screened, Plaintiff worked from home well past 6:00 p.m. on weeknights and worked an average of four (4) hours on most weekends, adding to his unpaid overtime.

56.    MARIE, fully aware that Plaintiff was consistently working in the evening and on weekends, instructed Plaintiff not to enter these additional hours in City Time and claimed she would "handle it with HR."

57.    When Plaintiff complied, MARIE rarely if ever forwarded his hours.

58.    Indeed, during Plaintiff's tenure Defendants acknowledged only seven (7) hours of compensatory time for the December 2023 holiday party and paid no other overtime premium.

59.    Between December 2023 and July 2024, Plaintiff's work hours ranged from approximately forty-six (46) to sixty (60) hours per week.

60.    Plaintiff also worked more than forty (40) hours per week, Monday through Friday, on multiple occasions in August 2024 and from January through March 2025.

61.    Defendants never provided Plaintiff with accurate wage notices or pay statements reflecting his true regular rate, overtime rate, or actual hours worked, as required by NYLL.

62.    Defendants willfully violated the FLSA and NYLL by: (i) requiring Plaintiff to work more than forty (40) hours per week without paying the mandated overtime premium; (ii) directing him not to record those hours; (iii) failing to keep and furnish accurate payroll records; and (iv) issuing deficient wage notices and pay statements.

63.    Worse still, CHEN and MARIE did not engage in these blatantly unlawful wage violations with non-Nigerian employees, and as such, this is further evidence that Plaintiff was treated less favorably and paid less because of his national origin.

### *Chens Heavy-Lifting Orders Precipitate Plaintiff's Injury*

64.    In addition to exploiting Plaintiff's talents and capabilities, Defendants, and more specifically CHEN, exploited Plaintiff by forcing him to perform physically demanding manual labor.

65.     From as early as May 2024, CHEN, in a perverse and discriminatory abuse of authority, repeatedly and exclusively singled out Plaintiff, an Administrative Coordinator, for strenuous manual labor, including the incessant lifting of heavy boxes-tasks utterly incongruous with his administrative duties and physical capacity.

66.     By way of example, on May 2, 2024, CHEN, via a Teams message concerning a delivery of copier paper to the mail room and copy room, questioned the visibility of the paper supply, communicating that displaying it openly would encourage increased staff consumption. As such, she then solely directed Plaintiff her designated lackey, to move approximately seventeen heavy boxes into a locked room and thereafter retrieve a few of the heavy boxes –and place them back in the copy room, whenever supplies were requisitioned, a physically taxing and completely unnecessary task.

67.     CHEN would also force Plaintiff to move furniture, file cabinets, act like a gopher and retrieve law books from around the office. Indeed, under MARIE'S and Chen's supervision, Plaintiff on the one hand suffered the indignity of being underpaid for doing work above his pay grade, while on the other, also suffered the indignity of doing manual labor that went beyond his job description, that CHEN asked none of her other direct reports to do.

68.      In April 2025, CHEN hired Tiffany Lo ("Lo") to fulfill the role of Administrative Coordinator, the exact **same** role as Plaintiff.

69.     At no time after Lo's hire, did CHEN ask her to engage in such taxing and manual labor as described above. To reiterate, CHEN demanded this of none of her other direct reports, other than Plaintiff, the only African employee she supervised.

70.     The relentless pattern of physically demanding assignments that CHEN maliciously imposed upon Plaintiff throughout 2024, directly and foreseeably caused Plaintiff to suffer a

debilitating knee injury, resulting in severe pain and stiffness for approximately three weeks leading up to early March 2025.

71.    Plaintiff duly informed CHEN and Manuela Blanc ("Blanc"), Defendants' Deputy Director of Operations, of his serious knee pain and his physician's recommendation for an MRI.

***Plaintiff's Protected Activities and Defendants' Swift Retaliation***

72.    On March 6, 2025, Plaintiff engaged in protected activity by lodging an internal complaint with Defendants' Human Resources ("HR") unit concerning his work-induced injury.

73.    The very next day, March 7, 2025, Wanda Didi ("Didi") of HR emailed Plaintiff, and copied, HR Director Jennelle Brooks ("Brooks"), acknowledging the work-related nature of his injury.

74.    In this email, Didi advised him to file a Worker's Compensation claim because his injury was job-related due to the heavy lifting that he was being directed to fulfill, explaining this was a safeguard for him should his knee issues persist, and Didi confirmed HR would provide the necessary documentation for both him and CHEN to complete.

75.    That same day, Plaintiff promptly emailed Didi and Brooks confirming his decision to pursue the claim and requesting the necessary forms, another protected act; Didi subsequently provided the claim form via email, again copying Brooks.

76.    Defendants' retaliation for Plaintiff's protected activities was immediate, calculated, and vicious.

77.    On Monday, March 10, 2025, CHEN launched her retaliatory offensive: at 8:08 a.m., she sent Plaintiff a Teams message, requesting that he suspend all his Operations tasks for the day until she received further instructions.

78.     Later that morning, CHEN summoned Plaintiff to her office, where she expressed profound dissatisfaction and anger that HR had sent her the workers' compensation form, revealing she had immediately consulted MARIE, Blanc, and Shawn Eduardo ("Eduardo"), an Administrative Procurement Analyst, for guidance on how to proceed.

79.     During this coercive meeting, CHEN overtly pressured Plaintiff to abandon his claim, insidiously suggesting it would be better if he refrained from completing the form. In response, Plaintiff disclosed that his doctor had prescribed him to have an MRI taken to render a more accurate diagnosis. Shockingly, CHEN then contemptuously dismissed the medical advice as merely money-driven and absurdly proposed he consider "nontraditional herbal treatment," citing her personal use of "Chinese oil" for a wrist ailment.

80.     To be clear, at no point during CHEN's meltdown did she humanize Mr. Bello and inquire as how he was feeling or express one scintilla of empathy for Plaintiff's condition. CHEN's demeanor, tone and language uniformly conveyed one message: she could care less about Mr. Bello's injury and was only concerned about how his knee injury would make her look.

81.     In response to Plaintiff communicating his steadfast intention, and undeniable right to proceed with both the MRI and the Workers Compensation claim, an irate CHEN declared she would consult MARIE regarding his claim, in yet another desperate attempt to intimidate Mr. Bello – who again remained resolute in his decision to the file claim.

82.     Immediately following this confrontation on March 10, 2025, as Plaintiff attempted to eat breakfast at his workstation, CHEN approached Mr. Bello's work area and vindictively prohibited him from eating or drinking there, decreeing that any such consumption must occur before his 7:00 a.m. shift commenced.

83.    Needless to say, prior to March 10th CHEN had never communicated the prohibition against "eating" in "work areas" to Plaintiff or any other employee that reported into her.

84.    Undeterred and also on March 10, 2025, Plaintiff formally notified Brooks via email of his physical limitations due to his acute knee injury, stating, "*Due to my acute knee injury, I will not be able to perform tasks that involve manually heavy lifting, pushing, pulling, or carrying heavy boxes of envelopes or printing papers for CCRB Operations. In addition to these, I will not be able to perform other tasks that involve carrying or lifting stuff with significant weight,*" a clear request for reasonable accommodation. See **Exhibit A**, Plaintiffs' email to HR.

***Plaintiff Engages in Further Protected Activity by Providing HR With Additional Accounts of the Discrimination he was being Subjected to by CHEN and the CCRB.***

85.    On March 12, 2025, Plaintiff met with Brooks, where he seized the opportunity to further described CHEN's discriminatory mistreatment, which included differential treatment, the assignment of menial labor culminating in his injury, the denial of remote work, and CHEN's and MARIE's prior unequivocal declarations that he would never receive a pay raise and should resign if dissatisfied.

86.    Starting with Plaintiff's ability to work a few days remote – arguably one of the most sought-after job perks since the pandemic, Mr. Bello had not been given any written eligibility guidelines for remote work when he was transferred to Admin and Operations in December 2023. Rather, CHEN and MARIE initially told Mr. Bello that he could be eligible for remote work after he is no longer on probation after spending one year at the agency.

87.    Shortly thereafter, Mr. Bello disclosed to HR that MARIE then gave Mr. Bello contradictory and disturbing information, by informing him that although he would be eligible for remote work in September 2024, CHEN would oppose granting Mr. Bello any remote work at that

time even though other staffers at CCRB including investigators, were allowed to work remotely after 6 months at the agency.

88.    Additionally, during the meeting with Brooks Plaintiff highlighted his substantial contributions, such as drafting the Five-Year Accessibility Plan and single-handedly managing recruitment tasks, without having received equitable compensation.

89.    Brooks acknowledged that Plaintiff was deserving of a significant pay increase for the accessibility plan and another for his recruitment duties; she poignantly remarked that his situation reminded her of her immigrant father from Trinidad and Tobago, whom she described as hardworking and similarly subjected to workplace discrimination and exploitation by coworkers, thereby recognizing the potential for national origin-based exploitation.

***CCRB's HR Department Asks Plaintiff to Take the Lead in Requesting Equitable Treatment and Equitable Pay, Emboldening CHEN, and MARIE to Engage in Further Acts of Misconduct.***

90.    Unfortunately, Brooks, rather than take the lead and independently investigate Plaintiff's claims, as any capable HR professional upon hearing concerning complaints of discrimination is required to do, she fecklessly placed the burden on Plaintiff. Brooks advised Plaintiff to request a meeting with Marie to discuss his pay, remote work arrangements, and his assigned tasks.

91.    Consequently, on March 17, 2025, Plaintiff emailed MARIE requesting a meeting to discuss remote work (a critical accommodation for his knee injury), his job tasks (given CHEN's inappropriate and physically damaging assignments), and a pay raise.

92.    MARIE callously ignored his request for four agonizing days before curtly responding by delegating to Brooks the task of scheduling a Teams meeting that was ultimately scheduled for March 25, 2025.

93.     On March 18, 2025, several days before the Teams meeting, Plaintiff submitted further medical documentation to HR, substantiating his injury and ongoing need for accommodation.

94.     The situation then catastrophically deteriorated on the day of the Teams Meeting.

95.     Several hours before the scheduled Teams meeting, CHEN nefariously inserted herself into the process and informed Plaintiff that his requests for remote work and a pay raise were "non-negotiable" and would "not be discussed," as she had unilaterally decided he would **never** be granted remote days or a pay increase.

96.     Further, CHEN informed Plaintiff that MARIE would not be at the meeting, but that she had discussed with MARIE prior to the meeting what she was going to say at the meeting and that she and MARIE were on the same page.

97.     CHEN then cruelly lamented the presence of numerous heavy boxes scattered throughout the office that she expected him to move, disdainfully questioning his utility to the unit if he was incapable of moving boxes. CHEN then asserted her dominance over Plaintiff and ordered him to lift a heavy box that very day, blatantly, maliciously and unlawfully disregarding his documented injury and explicit accommodation request.

98.     During the subsequent Teams meeting, which Brooks attended remotely, despite the gravity of the situation, CHEN informed Plaintiff that MARIE would no longer be his co-supervisor and that she alone would now supervise him.

99.     CHEN then viciously reiterated that Plaintiff was forbidden from eating or drinking at his workstation, imperiously commanding that he must be constantly working and was not permitted to eat or drink at his desk.  Indeed, CHEN continued to insist on this outrageous "decree" even after Brooks, from the comfort of her home, performatively attempted to intervene.

100.    CHEN then declared with chilling finality that Plaintiff would never receive a pay raise, he absolutely could not have remote days, and that Plaintiff was free to resign if he wished.

101.    After CHEN announced these permanent limitations to Plaintiffs employment "no raise" and "no remote workdays" Brooks remained conspicuously silent – never once during that exchange feeling the need to bring up her "immigrant father's" exploitation in the workplace.

102.    When Plaintiff responded by again describing the disparate and unfair application of remote work policies, highlighting that other employees enjoyed such privileges, CHEN responded by saying the quiet part out loud: "You are different," and "You should not compare yourself to other employees."

103.    To be clear, CHEN was permitted to engage in this vile and toxic behavior toward Plaintiff in front of Jennelle Brooks, the CCRB's HR Director, with impunity. At no point did Brooks make any meaningful attempt to correct, restrain, or even remind CHEN that Plaintiff had rights, and deserved basic respect. Brooks remained largely silent and gave CHEN *carte blanche* to go open season on him.

104.    And at no point after the meeting did Brooks initiate any investigation into whether CHEN's conduct was discriminatory or retaliatory.

*105.*    Overwhelmed by CHEN's relentless, orchestrated campaign of discrimination, retaliation, and unendurable harassment, that Defendants' so-called leadership enabled, Plaintiff was left with no alternative but to submit his resignation on March 25, 2025, citing his workplace injury and the discriminatory denial of remote work -- a clear and undeniable constructive discharge.

***Plaintiff is Forced to Resign and Defendants Lures him Back to Avoid a Lawsuit.***

106.    The day after his forced resignation, on March 26, 2025, Andre Applewhite ("Applewhite"), CCRB's Chief Prosecutor, in the Administrative Prosecution Unit ("APU") shockingly informed Plaintiff by phone that Defendants' Executive Director, Jonathan Darche ("Darche"), and MARIE were, in fact, pleased and relieved by his departure, as they were deeply unhappy that he had pursued a Workers' Compensation claim and reported his workplace injury.

107.    Applewhite revealed their primary motive was to shield CHEN, whom they regarded as their "golden child," and to protect CHEN's reputation from the blemish of a Workers' Compensation claim, further relaying that they harbored no sympathy whatsoever for Plaintiff's plight.

108.    Applewhite further disclosed that MARIE, in the presence of another employee, Jenifer Gonzalez, had been openly mocking Plaintiff, with both individuals callously laughing at his expense.

109.    Despite this manifest contempt, Darche, concerned about the looming threat of a lawsuit, called Plaintiff on March 27, 2025.

110.    During that phone call, Darche feigned utter ignorance of the preceding events, informed Plaintiff that he had learned from Applewhite that Plaintiff had been "unfairly treated," and manipulatively persuaded Plaintiff to rescind his resignation with a deceitful promise to address and resolve outstanding issues within two weeks, specifically acknowledging the remote work request and the Workers' Compensation claim.

111.    Tellingly, despite Darshe admitting to Plaintiff that Applewhite had informed him that Plaintiff had been "unfairly treated" and Plaintiff repeatedly expressing during the call that he had been discriminated against, Darche, the Executive Director of the CCRB, inquired no further.

112.    Indeed, at no time during said call did Darche – again the Executive Director of the CCRB – take the opportunity to "thoroughly" and "impartially" investigate Plaintiff's allegations as the CCRB purports to do on its website by giving Plaintiff a genuine opportunity to describe how he had been treated. Rather, when Plaintiff attempted to describe his reprehensible and discriminatory treatment, Darche deflected and pivoted towards ending the conversation.

113.    Nonetheless, Plaintiff, in a demonstration of good faith, afforded Defendants a final, undeserved chance, and retracted his resignation on March 29, 2025.

***After Plaintiff Rescinds his Resignation, Defendants Subjects him to an Increasingly Hostile Work Environment***.

114.    Plaintiff's medical reports dated March 31, 2025, and April 2, 2025, unequivocally confirmed that Plaintiff had suffered a "complex undersurface tear of the posterior body and posterior horn of the medial meniscus," an injury necessitating potential orthopedic surgery and rendering him unable to work from March 31, 2025, to April 30, 2025. See **Exhibit B** (MRI report).

115.    On April 2, 2025, Brooks, who had remained silent in the face of CHEN's above-described deplorable conduct, found her voice when it came to retaliating against Plaintiff. She emailed Plaintiff and threatened to mark him as Leave without Permission ("LWOP") if he did not submit detailed medical records, including his MRI results to HR.

116.    Plaintiff complied with HR's request and submitted his medical records and MRI results.

117.    On May 1st, after being cleared by his doctor, Plaintiff returned to work, where he received an email from Brooks awarding him a measly one day of remote work.

118.    Absolutely frustrated by Defendants commitment to treating him less favorably than his co-workers who at minimum received two days of remote work, Plaintiff sent Brooks an email which stated in part: *"Jennelle, I don't understand why CCRB continues to treat me*

*differently from other CCRB staffers in my unit who have two days of remote work. And other staffers at the agency? The Executive Director, Jon Darche, when he called me on March 27 this year, asked me to give him two weeks to resolve this. After months, I am still being treated differently… "Tiffany Lo started working here at CCRB in April 2025, and she got the same job title for Operations as me, Administrative Coordinator. (Winnie Chen, Jon Darche, Jeanine Marie, and HR granted Tiffany Lo, who has not spent a month at the agency, two days of remote work on Wednesday and Friday. I have been at this agency for almost two years now I have not gotten remote work …. I don't deserve to be treated differently.*

119.    In response to Plaintiff's email providing a stark example of his in equitable treatment, HR simply acknowledged receipt and gave zero indication any corrective action whatsoever would be taken.

### *After Returning to an Increasingly Hostile Work Environment Plaintiff Files an EEOC Charge to Assert his Rights.*

120.    Facing an unrepentant and malicious employer that had systematically discriminated against him based on his national origin and disability, viciously retaliated against him for his protected activities, subjected him to an intolerably hostile work environment, unlawfully denied him legally mandated accommodation, equitable pay, all of his earned overtime, and constructively discharged him, Plaintiff was compelled to seek redress.

121.    In or around the same time frame, on April 8, 2025, Plaintiff filed formal charges of discrimination with the Equal Employment Opportunity Commission (EEOC No. 520-2025-04203), alleging discrimination based on his age, color, national origin, and race, as well as unlawful retaliation; his complaint detailed, among other egregious acts, the discriminatory assignment of manual labor, failure to compensate for overtime, unjust exclusion from remote

work opportunities afforded to others, and discriminatory workplace restrictions designed to humiliate and marginalize him.

122.    Defendants responded by submitting a position statement riddled with outright falsehoods, half-truths, and glaring omissions. The CCRB baldly asserted that Plaintiff had been paid overtime approximately thirty times, yet Plaintiff's pay stubs show a drastically less amount—conclusive proof that Plaintiff is owed a significant amount for his overtime premium pay.

123.    Moreover, Defendants, in a transparent attempt to justify the manual labor that CHEN had illegally subjected Plaintiff to, submitted a job description of Plaintiff's duties that was materially different from the job description of Administrative Coordinator, on the CCRB Website, and NYC.GOV/JOBS Website which lists the core functions of the position.[2] Unlike the fabricated job description submitted to the EEOC,  the CCRB's Administrative Coordinator job description ("AC"), which applies to all five boroughs, does not list the "special duties" Defendants itemized in the job description to the EEOC, such as "replenishing paper in the copier room where needed" and "pick up operations deliveries at reception." Nor does the AC job description posted on the CCRB website list the additional functions Defendants required Plaintiff to do, such as "reception coverage" or recruitment tasks such as "posting job vacancies and screening job applicants" or "drafting Defendants' Five-Year Accessibility Plan."

124.    Defendants' apparent need to create a "special" job description unique to Mr. Bello, to protect CHEN and cover-up her blatant discrimination and dehumanization of Plaintiff, as well as Defendants' grossly underpayment of Plaintiff, only strengthens his claims.

125.    After Plaintiff filed his EEOC Charge, Defendants retaliated by transferring Plaintiff to the APU Unit, over his objection.

---

[2] https://cityjobs.nyc.gov/job/administrative-coordinator-in-nyc-all-boros-jid-25307

126.    The APU Unit is presided over by Michelle Rae Cruz ("Cruz") Supervising Trial Assistant, who is another reputed bigot.

127.    Soon after his transfer, Plaintiff sensed hostility from Cruz. As a result, he immediately sought advice from Applewhite during a closed-door meeting on how he could secure a favorable impression from Cruz to ensure a better work environment. Shockingly, Applewhite made it clear to Plaintiff that Cruz has certain **"criteria"** to meet her approval, one of which is being **"White"** and then advised Plaintiff that because of this criteria **"…focus in pleasing her is going to be lost."**

128.    Applewhite has also warned Plaintiff since his forced transfer: **"You are being watched"** and **"They will try to get rid of you" even…with worker's comp."** They do not like the fact you filed because, **"That's money out of the city's pocket. It makes Winnie look bad…"** **"And if they have to choose between you and Winnie, you lose."**

129.    Further, Applewhite has recently disclosed to Plaintiff that he is now being targeted for termination, for his affiliation with Plaintiff and his unwillingness to jump on the leadership's illegal retaliation bandwagon against Plaintiff for filing a Workers Compensation claim.

130.    As a result of the Defendants' unlawful actions, which are ongoing, Plaintiff has been forced to endure severe mental anguish, humiliation stress, a serious knee injury that will require surgery and therapy to heal, and a recent trip to the ER as a result of stress-induced chest pains, while, WINNIE CHEN, the main individual who subjected him to such unlawful conduct remains protected by the CCRB. It is a disgrace and an injustice that this lawsuit will seek to rectify.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Unpaid Overtime Under the FLSA*

131.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

132.    29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay, or one and one-half the minimum wage rate, if greater, for all hours worked exceeding forty in a workweek.

133.    As described above, Defendants is an "employer" within the meaning of the FLSA, while Plaintiff is an "employee" within the meaning of the FLSA.

134.    As described above, from December 2023 through July 2024—and again during multiple workweeks in August 2024 and January through May 2025—Plaintiff regularly worked more than forty (40) hours per week, yet Defendants willfully failed to pay the overtime premiums mandated by the FLSA.

135.    For each of those overtime workweeks, Plaintiff is entitled to wages at one-and-one-half times his regular hourly rate of pay, or one-and-one-half times the applicable minimum wage, whichever is greater, for every hour worked in excess of forty (40).

136.    Plaintiff is entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants' violations of the FLSA's overtime provisions.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Unpaid Overtime under the NYLL and the NYCRR*

137.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

138.    N.Y. Lab. Law § 160 and 12 NYCRR § 142-2.2 require employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay, or one and

one-half times the minimum wage rate, if greater, for all hours worked exceeding forty in a workweek.

139.    Defendants is an "employer" within the meaning of the NYLL and the NYCRR, while Plaintiffs is an "employee" within the meaning of the NYLL and the NYCRR.

140.    From December 2023 through July 2024—and again during multiple workweeks in August 2024 and January through May 2025—Plaintiff regularly worked more than forty (40) hours in a week, yet Defendants failed to pay the overtime premiums required by the NYLL and 12 N.Y.C.R.R. § 142-2.2.

141.    For each of those overtime workweeks, Plaintiff is entitled to wages at one-and-one-half times his regular hourly rate of pay, or, if higher, one-and-one-half times the applicable New York minimum wage for every hour worked in excess of forty (40).

142.    Plaintiff is also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendants'' violations of the NYLL's and NYCRR's overtime provisions.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Pay Equity Violation of NYLL § 194)*

143.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

144.    NYLL § 194 prohibits employers from paying any employee because of his status as a member of a protected class a wage at a rate less than the rate at which an employee without a status within the same protected class or classes in the same establishment is paid for (a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

145.    As described above, Defendants is an "employer" while Plaintiff is an "employee" and member of a protected class due to his national origin (Nigerian).

146.    Defendants has engaged in a pattern and practice of discriminating against Plaintiff on the basis of his membership in a protected class due to his national origin (Nigerian) by paying him a wage at a rate less than the rate at which employees without status within the same protected class (i.e., non-Nigerian origin) in the same establishment were paid for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions. This includes, but is not limited to, Defendants' refusal to provide Plaintiff a pay raise from his annual salary of $46,971.97 despite his extensive responsibilities and contributions that significantly exceeded his official job description and pay grade, such as drafting Defendants' Five-Year Accessibility Plan and single-handedly managing job postings and applicant screening after the Recruitment Director's departure in early June 2024.

147.    The differential in pay between Plaintiff and employees without status within the same protected class (i.e., non-Nigerian origin) was not based upon a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a bona fide factor other than national origin, such as education, training, or experience, but was due to Plaintiff's Nigerian origin. Plaintiff's performance and contributions, including "pivotal drafting of Defendants' Five-Year Accessibility Plan" and "single-handedly managing job postings and applicant screening," demonstrate his work was not deficient in merit, quantity, or quality.

148.    Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on national origin in violation of the Equal Pay Act.

149.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

150.    Plaintiff is entitled to all remedies available for violations of the NYLL's Equal Pay provisions, including but not limited to backpay, double liquidated damages (i.e., treble damages when combined with their actual damages), front pay in lieu of reinstatement, attorneys' fees and costs, and other appropriate relief.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Failure to Furnish Proper Wage Statements in Violation of the NYLL*

151.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

152.    N.Y. Lab. Law § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee.

153.    Defendants is an "employer" within the meaning of the NYLL, while Plaintiff is an "employee" within the meaning of the NYLL and the NYCRR.

154.    As described above, on every payday covering the overtime workweeks Plaintiff worked, Defendants failed to provide Plaintiff with a wage statement that accurately listed his regular and overtime rates of pay, the true number of hours worked, and the other information required by New York Labor Law § 195(3).

155.    Pursuant to NYLL § 198(1-d), Defendants is liable to Plaintiff in the amount of $250.00 for each workday that the violations occurred, up to a statutory cap of $5,000.00.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Disability Discrimination in Violation of the NYSHRL)*

156.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

157.    The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's disability.

158.    Defendants, through their agents, as described above, discriminated against Plaintiff in violation of the NYSHRL by failing to provide reasonable accommodations for his physical disability (knee injury), such as denying his request for remote work and continuing to assign him tasks inconsistent with his documented physical limitations, and ultimately constructively discharging him.

159.    Defendants further subjected Plaintiff to discriminatory treatment by, among other things, ordering him to perform strenuous manual labor, such as lifting heavy boxes, despite his documented knee injury and explicit requests for accommodation, thereby exacerbating his medical condition.

160.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

161.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(National Origin Discrimination in Violation of the NYSHRL)*

162.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

163.    The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's national origin.

164.    Defendants, through its agents, as described above, discriminated against Plaintiff, a person of Nigerian origin, in violation of the NYSHRL by subjecting him to disparate treatment, a hostile work environment, and ultimately constructive discharge on the basis of his national origin.

165.    Defendants further subjected Plaintiff to discriminatory treatment by, among other things, denying him privileges afforded to other employees, such as remote work, with a supervisor stating he was "different" and should not compare himself to Defendants' other employees, and by subjecting him to demeaning comments and exploitative working conditions.

166.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

167.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Retaliation in Violation of the NYSHRL)*

168.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

169.    Plaintiff engaged in protected activity under the NYSHRL by, *inter alia*, lodging an internal complaint with Defendants' HR unit concerning his work-induced injury on March 6, 2025, confirming his decision to pursue a Workers' Compensation claim on March 7, 2025, formally notifying HR of his physical limitations and requesting reasonable accommodation for his knee injury on March 10, 2025, reporting discriminatory mistreatment to HR on March 12, 2025, requesting a meeting with management to discuss accommodations and discriminatory treatment on March 17, 2025, and filing formal charges of discrimination with the EEOC on April 8, 2025.

170.    Defendants, through its agents, as described above, retaliated against Plaintiff for engaging in protected activity by, among other actions, expressing anger towards him for filing a Workers' Compensation claim, prohibiting him from eating or drinking at his workstation, ordering him to perform tasks contraindicated by his injury, denying his requests for reasonable accommodation and a pay raise, subjecting him to increased scrutiny and hostile treatment, mocking him, and ultimately constructively discharging him.

171.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

172.    As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-

confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Disability Discrimination in Violation of the NYCHRL)*

173.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

174.    Defendants, through its agents, as described above, discriminated against Plaintiff in violation of the NYCHRL by subjecting Plaintiff to a hostile work environment due to his physical disability (knee injury), failing to provide reasonable accommodation such as remote work and modified duties, and ultimately constructively discharging him.

175.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

176.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(National Origin Discrimination in Violation of the NYCHRL)*

177.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

178.    Defendants, through its agents, as described above, discriminated against Plaintiff in violation of the NYCHRL by subjecting him, an employee of Nigerian origin, to disparate

treatment and a hostile work environment based on his race and national origin, including by denying him privileges such as remote work that were afforded to other employees, and ultimately constructively discharging him.

179.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

180.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### *(Retaliation in Violation of the NYCHRL)*

181.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

182.    Plaintiff engaged in protected activity under the NYCHRL by, inter alia, lodging an internal complaint with Defendants' HR unit concerning his work-induced injury, pursuing a Workers' Compensation claim, formally notifying HR of his physical limitations and requesting reasonable accommodations for his knee injury, reporting discriminatory mistreatment to HR, requesting a meeting with management to discuss accommodations and discriminatory treatment, and filing formal charges of discrimination with the EEOC.

183.    Defendants retaliated against Plaintiff for engaging in protected activity by, among other actions, intensifying discriminatory and hostile treatment, including expressing anger over

his protected claims, imposing arbitrary workplace restrictions, denying his requests for accommodation and equitable treatment, and ultimately constructively discharging him.

184.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which he is entitled to an award of monetary damages.

185.    As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, anxiety, stress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

## JURY DEMAND

186.    Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States, New York State and New York City laws;

b.    Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to back pay and front pay;

d.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

e.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

f.      An award of punitive damages under NYSHRL and NYCHRL;

g.      An award of damages that Plaintiff has sustained as a result of the Defendants' conduct, including all unpaid wages and any shortfall between wages paid and those due under the law that Plaintiff would have received but for Defendants' unlawful payment practices;

h.      Liquidated damages and any other statutory penalties as recoverable under the FLSA and NYLL;

i.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

j.      Any such other and further relief as the Court may deem just and proper.

Dated: New York, New York
         July 16, 2025

                                        Respectfully submitted,

                                        **JOSEPH & NORINSBERG, LLC**


        By:    _____

                                        BENNITTA L. JOSEPH, ESQ.
                                        825 Third Ave., Suite 2100
                                        New York, New York 10022
                                        Tel.: (212) 227-5700
                                        Fax: (212) 656-1889
                                        *Attorneys for Plaintiff*